IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

SCOTT THOMAS SCHNEIDER,

       Plaintiff,

v.

HARMON SOLUTIONS GROUP, LLC, et
al.,

       Defendants.

OPINION and ORDER

Case No.  19-cv-202-wmc

---

*Pro se* plaintiff Scott Thomas Schneider claims that his former employer, defendants

Harmon Solutions Group LLC and Code Blue LLC, discriminated against him because of

his disability in violation of the Americans with Disabilities Act ("ADA").[1]  Before the

court is defendants' motion for summary judgment (dkt. #36), which will be granted for

the reasons that follow.

UNDISPUTED FACTS[2]

**A.  Background**

Plaintiff Scott Thomas Schneider worked at Harmon from June 27, 2016, to June

19, 2018.  Schneider originally named only Harmon as his employer, but in his amended

---

[1]  The court previously granted plaintiff leave to proceed against defendants Harmon, Code Blue, Vanessa Bluem, and Nicole Darby on a retaliation claim under the Family and Medical Leave Act ("FMLA"), and against Harmon and Code Blue on a gender discrimination claim under Title VII of the Civil Rights Act of 1964.  However, Schneider has withdrawn both claims (*see* dkt. #57, at 2, # 68, at 1), so these defendants are entitled to judgment in their favor on those claims without further discussion.  Further, although Bluem has not actually been served in this lawsuit, judgment on this claim against her is appropriate, since he has explicitly withdrawn it.

[2]  Unless otherwise noted, the following facts are undisputed and material, and will be construed in the light most favorable to plaintiff as the non-moving party.

complaint added Code Blue as an additional defendant because of his understanding that the two companies were affiliated and Harmon no longer exists.  Therefore, Schneider repeatedly refers to his employer as "Code Blue LLC."  Defendants acknowledge that the two companies are affiliated, and that after Schneider's employment ended, Harmon went through a corporate change, although are less specific as to Harmon's current legal status. Regardless, defendants concede that Harmon and Code Blue LLC may be treated as the same entity for purposes of summary judgment in this case.  So, for the sake of simplicity and because that was the name of the company when Schneider worked there, the court will refer to Schneider's employer as "Harmon."

Harmon is an insurance claims business that operates in Wisconsin and Ohio. Schneider worked at a call center located in Eau Claire, Wisconsin, as an entry level insurance claim processor for windshield repair, automobile tempered glass repair and first notice of loss ("FNOL") claims.

### B.  Schneider's Employment and Requests for Accommodations

Schneider generally worked second shift hours at Harmon, which were from noon to 8:30 p.m.  Throughout his employment, he suffered from symptoms of chronic fatigue syndrome, although he was not formally diagnosed with that condition until February of 2018, just a few months before his termination.  In the fall of 2016, Schneider requested a part-time schedule as an accommodation for his yet-to-be-diagnosed medical condition, which was granted.

Because of his condition, Schneider claims that he often clashed with his supervisor Haley Zblewski.  For example, Schneider often sighed on his phone because of his medical

condition, and Zblewski would inform Schneider that sighing was not appropriate during client interactions.  One day in October of 2016, Schneider complained to the call center floor manager about Zblewski, then asked to leave for the day to catch up on energy.  Schneider then left early that day.

In early January 2017, Schneider became so frustrated with Zblewski that he left work -- this time, apparently mid-shift.  At the end of January, Schneider contacted Harmon's HR Director John Parris, who was located in Ohio.  Parris initiated paperwork for Schneider to take leave under the Family and Medical Leave Act ("FMLA"), which Schneider began February 3, 2017.  Before leaving, Schneider also discussed his disabling pain and exhaustion with a co-worker, Erica Hudson, who Schneider befriended and came to rely on for moral support at Harmon.

Schneider returned to work on May 8, 2017.  Upon his return, Supervisor Zblewski accommodated Schneider's need to have a heating pad; she also ensured that Schneider had space to do stretches during his breaks.  Despite these measures, however, Schneider described being very uncomfortable while working, which caused him to say inappropriate things to a customer insured by Harmon when discussing repair issues.  This led to a disciplinary action described in more detail below.  Schneider also started standing to alleviate some physical discomfort, which was inconsistent with Harmon's policy discouraging employees from standing when taking phone calls out of concern for the privacy of insureds.  Schneider was aware of this policy and understood its rationale.  (A standing employee's voice carries throughout the call center because the cubicle walls cannot muffle the communication.)  On August 2, 2017, consistent with this policy,

3

Zblewski asked Schneider to sit in his chair while he took insurance calls, explaining his voice carried.

After this interaction, Schneider began sharing his frustrations with Hudson, telling her that standing up relieved his discomfort and that he believed the company did not care about his suffering.  Schneider also told Zblewski in an instant message that he felt like a nuisance.  Zblewski did not respond to this message, and Schneider later indicated, "I guess I am far enough along now that I can deal with it."  (Dkt. #53-5, at 19.)

On October 8, 2017, Schneider also received an email from mid-shift supervisor Vanessa Bluem, which stated that Schneider could no longer stand up at his desk while taking calls from insureds because it was a breach of confidentiality, in violation of business policy.  HR Director Parris and Zblewski were both copied on this email, prompting Schneider to contact Parris regarding a workplace accommodation.  On October 12, 2017, Schneider further brought in a work note from Nurse Practitioner Susan Prince, which stated "patient is to be allowed to stand during work/phone calls."  (Def. Ex. 7 (dkt. #53-7), 1.)  After Schneider's request was approved, he claims that Zblewski told him "to think about desk arrangements," but shortly after changed course, informing him that Parris had directed Schneider to move over to a standing desk and that he could not argue about it.  That desk was located behind a cluster of cubicles where Schneider's team worked, a few feet away from the call center employees, and one aisle from the cluster of cubicles where Schneider usually sat.  However, it was not in the center of the room, in an effort to maintain confidentiality of the callers.

4

Because he was far from his co-workers and the location had poor lighting, Schneider was dissatisfied with this accommodation. Schneider shared his dissatisfaction with a supervisor working in Ohio, Veronica Moore, via an "instant message," writing simply that he was not happy with his location. Although there is no evidence that Schneider followed up directly with Parris or anyone else in HR about his concerns, Schneider claims that after receiving no response to his message to move, he no longer wanted the standing desk. Therefore, he went back to Nurse Practitioner Prince for a letter rescinding the need for a standing desk, which he received on October 17, 2017. That note specifically stated: "No accommodations needed in order to perform his job. [Schneider] is needing to stay in environment closely with colleagues to continue to collaborate for quality performance." (Def. Ex. 7 (dkt. #53-7) at 2.) Schneider then returned to his previous desk. According to Schneider, HR Director Parrish had arranged to move him to a standing desk, and when Schneider moved back to his original desk, Zblewski told Schneider he could return to his old desk, but Parris did not want him to complain anymore.

At the end of October, Bluem became Schneider's direct supervisor, and Schneider states that because of "animosity" between them, he did not bring up any health issues with her. Later, in November, Schneider started getting sick, causing him to miss work and be late multiple times, although he did not notify anyone at Harmon that his absences and tardiness were health-related. In December 2017, when Bluem raised concerns about Schneider's recent absences, he responded by asking Bluem about a standing desk again, citing his chronic fatigue and pain. According to defendants, Bluem responded that

Schneider could have a standing desk, but it would not be in the center of the room. Schneider simply testified in his deposition that Bluem told him "arbitrarily that there was only one spot on the floor I could go, and she pointed to it.  It was a corner of the room away from everybody."  (Schneider Dep. (dkt. #55) 55.)  There is no dispute that the place Bluem offered was in a different, further spot than previously offered to Schneider, which had been about four cubicles and one aisle away from his original cubicle.

At that time, Schneider also asked whether it would be possible to have a floor coach who visited desks, known in Harmon's parlance as a "floor walker," come down and talk to him every once in a while.  Rather than grant this request, Bluem suggested that Schneider might consider psychological help if he was struggling with working at an isolated desk.  Schneider again chose not to accept the standing desk option.  Instead of renewing his request for a standing desk, Schneider then requested a different chair as an accommodation.  Schneider did not provide a doctor's note related to that request, which was not granted.  Schneider claims he did not obtain a doctor's note because he viewed this as a barrier to being accommodated, and Bluem was simply trying to make the process more difficult for him.

On January 6, 2018, Schneider went on FMLA leave for three months.  Schneider claims that Bluem expressed curiosity about his health, and she indicated a willingness to help him find a different chair when he returned.  While Schneider was on leave, his attempt to engage in physical therapy failed; and in February 2018, he was diagnosed with chronic fatigue syndrome by a different Nurse Practitioner, Amanda Molback.

6

On March 29, 2018, Schneider called Bluem and told her that Nurse Practitioner Prince said it would be best for him to return to work on April 9.  Schneider also said he looked forward to speaking with Bluem about his hours so that he could manage his physical symptoms.  Bluem agreed to meet with him on April 5, and Schneider provided a work note from NP Prince, dated March 29, which stated that Schneider should work no more than 24 hours per week.  According to Schneider, when they met, Bluem provided him a schedule in which he would work three days *in a row*, from 8 a.m. to 5 p.m., telling Schneider that if he did not accept those hours, he would not have a job.  Schneider became upset, telling her that given his recent diagnosis, that schedule would not work.  After meeting Bluem, Schneider then called Parris, but he declined to provide input about his schedule.  Schneider then obtained a second note from NP Prince, dated April 6, which listed a proposed schedule that provided for a day off during the week.

On April 9, 2018, Schneider returned to work and had to undergo training, during which Bluem allegedly came to speak with him and explained that he could not set his own schedule.  This prompted Schneider to submit a third note from NP Prince, dated April 10, which detailed an appropriate schedule, and which Bluem approved.

Schneider states that his subsequent training went well, and he was able to manage his condition well and to function better and perform well in the call center.  However, Schneider started dealing with other issues, including his co-workers commenting on his lack of energy and confidence.  Scheider raised these issues with Bluem, who informed him he should contact HR if he needed a medical accommodation.

On May 10, 2018, Schneider next had a meeting with Nicole Darby, the operations manager.  During that meeting, Schneider apparently complained about the work atmosphere, including his concerns about his co-workers "comments," and discussed his needed accommodations for his disability.  In particular, referencing the EEOC Enforcement Guidelines, Schneider explained that he was upset with remarks people were making about his condition, as well as remarks about how he looked and handled himself.  Darby responded that although she could not control the *thoughts* of others in the workplace, if any of them made inappropriate remarks, Schneider should inform her and she would address it.  Schneider also asked Darby to arrange a meeting with the three supervisors on his call floor, so that he could share information about chronic fatigue syndrome and others could appreciate the nature of his disability.  Darby declined this latter request, stating, "I think you underestimate my supervisors."  She also explained that discussing his medical issues would be problematic because of privacy concerns, and that Schneider should instead consider talking to his direct supervisor alone.  (Dkt. #64, at 124.)

### C.    Schneider's Conduct at Harmon and June 2018 Termination

During his employment Schneider received multiple warnings about his conduct in the workplace, one of which led to his June 2018 termination.  Since three warnings were not directly related to his termination, the court will not focus on the details of those

warnings.[3]   Instead, Harmon maintains that it terminated Schneider because of his communications with his co-worker Hudson in August of 2017, and then again in 2018.

Specifically, Schneider was romantically interested in Hudson.   According to Schneider, they first became friends when he started at Harmon in 2016, and Hudson did not explicitly rebuff his advances until August of 2017, when Schneider attempted to start a romantic relationship with her.[4]   On August 2, 2017, in particular, Schneider wrote Hudson a message stating:  "BTW -- it's been so busy - I've been DYING to tell you that I LOVE the braid the last couple of days and that you're wearing that AMAZING top today."  (Schneider Dep. (dkt. #55) 105.)  On August 5, 2017, Schneider and Hudson went out for drinks.  As they were leaving, Schneider told Hudson that he wanted to kiss her on the cheek but would settle for a hug, and Hudson declined in a way that Schneider perceived to convey revulsion.

The next day, Schneider sent the following message to Hudson at work:  "[Y]eah, you're just not getting the fact that there is such compatibility here you won't find in a lot of places and you don't even seem to grasp that so forget it."  (*Id.* at 80.)  Schneider also wrote:

> I cried myself to sleep last night after what happened at the car
> -- I cried for 40 minutes -- 20 years of depressed, agonizing
> loneliness, I hadn't cried that long since I was a kid, it wasn't

---

[3] In 2017, Schneider had been warned about not swearing during customer calls, not making disparaging comments about Harmon to its insureds, and needing to communicate about any absences and tardiness.

[4]  Schneider includes numerous additional proposed findings of fact laying out the details of his relationship with Hudson and posing legal challenges to the process by which he was disciplined for his behavior towards Hudson (*see* PPFOF ¶¶ 84-112, dkt. #59).  Although some of these facts are material and will be addressed, for the most part they are immaterial to the claims before the court and have been omitted.

> little tears and such -- they just flowed down my face, I never felt so rejected.

(*Id.* at 106-07.)  He further wrote:

> Erica -- I'm lonely, for God sake -- OMG -- why doesn't this register with you.  I've spent my entire afternoon trying to tell you how devastated I am and you just think these negative emotions.   Again, you try suffering without love, companionship and no friends for 20 years!!  OMG this is like a bad dream -- I thought you had compassion but maybe you don't.

(*Id.* at 91.)

Hudson responded that same day:  "I don't mean to hurt your feelings, but we [are] just friends and I personally have never dated any coworkers of mine, that can get complicated."  (*Id.* at 107.)  During his deposition, Schneider acknowledged that his communications with Hudson were inappropriate in a work setting and understood why Harmon would not want employees having conversations like these at work.  Schneider further admits that although he knew Hudson did not want a romantic relationship, he tried to change her mind for a while after these communications.

Worse still, on August 8, 2017, Schneider asked Hudson about pornography and prostitution rings through the Harmon messaging system.   Unsurprisingly, Hudson responded that she also did not want to discuss those subjects with him.   Nevertheless, Schneider claims that the only reason he sent this message was because other co-workers had been discussing those same issues the day before, and that he had asked Hudson specifically about legalization of prostitution, and she responded that she was in favor of legalization.   Schneider says this question was just a follow-up, and he ended the conversation once she indicated no interest in discussing those subjects.

Schneider also acknowledges a further interaction he had with Hudson on August 14, 2017, over the company's instant messenger system.  (*See* dkt. #53-5, at 31-34.)  In response to a follow up Facebook message that Schneider wrote indicating it would be hard to be friends with her, Hudson wrote that she wanted to give him space.  She also described his original message as "aggressive," to which Schneider responded that he was going through a very hard time.  (*Id.* at 32.)  Soon after, Hudson went on vacation, and when she returned to the office on September 4, 2017, Schneider gave her an apology card and candy, and the two chatted amicably.

On September 6, 2017, however, Supervisor Zblewski summoned Schneider to a conference room with him, an old operations manager and HR Director Parris (via video cast).  During the meeting, Parris informed Schneider that they had become aware of the messages between Hudson and him between July and August.  Schneider received a final warning for violating Harmon's standards of professionalism/interaction with customers and co-workers, meaning that any future violation of that type would result in further disciplinary action, including termination.  Additionally, Parris brought up another series of messages between Schneider and Hudson from earlier in the summer, in which Schneider sent a derogatory message about Asians, writing, "Those Asians have massage parlors."  (Schneider Dep., dkt. #55, at 92.)  Schneider also admitted that he sent a derogatory message about Native Americans.  (*Id.* (admitting writing to Hudson "Wow, so why in the world are all these Native Americans alcoholics and drifters and such?").)

As a result, the formal corrective action notice created for this final warning also referenced Schneider's derogatory comments about Native Americans and Asians as well.

11

(*See* dkt. #53-3, at 1.)  Schneider signed that form on September 6, and he also admitted in his deposition that the messages he sent to Hudson should not have been sent over the company's instant messenger system.  (Schneider Dep., dkt. #55, 82.)  Still, Schneider now claims that he signed the form under duress because Parris concluded that Schneider had misbehaved, refusing to hear his side of the story or inquiring into Hudson's role.

Schneider claims that after this meeting, both his health and relationship with Hudson deteriorated.  During this period, Hudson was working as a floor coach, and Schneider states that she made certain, unspecified comments about his condition that were "unempathetic."  On March 18, 2018, shortly after his chronic fatigue syndrome diagnosis and his return from FMLA leave, Schneider next wrote to Hudson over Facebook, telling her about the diagnosis.  When she did not respond, he followed up over Facebook, asking "Are you at all curious?"  (Dkt. #64, at 352-53.)  A week later, on March 25, Schneider again wrote to Hudson about his condition, and she did not respond to that message either.

According to Schneider, when he returned to work in April, Hudson was again initially nice to him, but then acted erratically, sometimes friendly towards him and other times ignoring him.  In particular, after Schneider had a meeting with Operations Manager Darby in May 2018, Schneider attempted to share his frustration with Hudson, but she was not interested in talking to him about his work-related issues.  Schneider later sent a Snapchat message to Hudson, indicating she did not seem to "give a crap about him" and that he was unfriending her on that platform.  (*See* dkt. #64, at 88.)

Schneider claims that on June 4, 2018, he happened to punch out just before 9:00 p.m., then "ran into" Hudson near a vending machine and attempted to apologize to her. Hudson told him not to worry about it and that she had to go, and Schneider let her leave. In contrast, Harmon maintained that this exchange took place on June 11, and that Schneider had actually waited for Hudson after his shift had ended so that they could interact.  Regardless, it is undisputed that on June 13, 2018, Schneider sent Hudson flowers, with a note, and later that same night, he followed up with a Facebook message to Hudson, letting her know that he had sent the flowers.  Hudson responded by thanking him for the flowers.

The next day, June 14, Schneider received a birthday card from his co-workers, which he noticed Hudson did not sign.  Schneider brought the card to Hudson's desk and asked her to sign the card, which she did.  Schneider then asked Hudson about their relationship status, and Hudson responded that because she was now a supervisor, their relationship had changed.  Schneider responded that he understood.  Even so, Schneider perceived that Hudson left their conversation with a "sense of aggravation."

Despite this, at best, awkward exchange, Schneider sent Hudson several additional Facebook messages between June 14 and 15, all of which went unanswered by Hudson. (*See* dkt. #64, at 377-78.)  Then, on June 14, Schneider used the company's instant messenger to write:  "[L]ook, I won't bite.  I just sent you flowers."  (Dkt. #53-3, at 4.) On June 15, 2018, Hudson filed a formal harassment charge against Schneider for unwanted advances.  On June 18, Schneider sent Hudson a series of instant messages through the company's instant messenger system.  When she indicated that she just

wanted a professional relationship with him, he expressed frustration about her change in attitude.  (*See* dkt. #53-5, 47-48.)

On June 19, 2018, Schneider's employment was terminated in a final corrective action form for again violating Harmon's standard of professionalism/interaction with customers/co-workers.  That form included the following statement:

> On 6/15/18 a co-worker filed a harassment complaint against Scott for unwarranted advances.  On 6/11/18 after Scott's shift was complete he waited near an exit for nearly 30 minutes for her shift to finish so he could approach her.  On 6/13/2018 [h]e sent her flowers anonymously with a note "For all you do".  Later that night Scott sent her a lengthy message on Facebook telling her he sent the flowers.  She did not respond to the messages.  On 6/14/2018 Scott sent her an Instant Message via Company Computer saying "Hi - What did you have for lunch?"  When she did not respond he sent her another message about 2 hours later saying "Look -- I won't bite -- I just sent you flowers."

(Dkt. #53-3, at 4.)   Whatever Hudson's perception, Schneider still disputes *actually* stalking Hudson outside the building, describing their interaction as a chance encounter as they both were leaving; he further claims that no one at Harmon was willing to hear his side of the story.


OPINION

Plaintiff was granted leave to proceed against defendants Harmon and Code Blue on reasonable accommodation and discrimination claims under the ADA, and defendants seek summary judgment with respect to both claims.  Summary judgment is appropriate if the defendants show "that there is no genuine dispute as to any material fact and [they are] entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a), even if all reasonable

inferences are drawn in favor of plaintiff as the nonmoving party.  *Ozlowski v. Henderson*, 237 F.3d 837, 839 (7th Cir. 2001) (citing *Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685, 692 (7th Cir. 1998)).  However, to avoid summary judgment as the party with the burden of proof, plaintiff must still marshal enough evidence -- not merely a scintilla -- to permit a reasonable jury to rule in his favor.  *Nowak v. St. Rita High School*, 142 F.3d 999, 1002 (7th Cir. 1998) (internal citations omitted).

Before addressing defendants' arguments, the court must briefly address plaintiff's opposition brief, which is 182 pages long, single-spaced and includes dozens of pages of extraneous facts about Schneider's medical condition, the EEOC investigation into his claim, EEOC guidance, and other, irrelevant legal analysis.  Although an opposition of this length might conceivably be appropriate in some case somewhere, this is certainly not one of them, and it is not the court's responsibility to read through pages and pages of irrelevant information hunting for something that bears on defendants' motion.  *See United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs.").  In any event, since the evidence of record drives the court's analysis, and the court incorporated *plaintiff's* version of the facts as set forth above, the court will gloss over his arguments and instead focus on the material facts.[5]


I.      **Reasonable Accommodation**

To succeed on a claim of failure to accommodate under the ADA, a plaintiff must

---

[5]  Plaintiff also recently filed a motion to correct his opposition, in which he makes several corrections to his opposition brief.  (Dkt. #72.)  That motion is GRANTED, and the court has reviewed his corrections, which address various clerical errors but do not require separate discussion.

15

prove that: (1) he is a qualified individual with a disability; (2) the employer was aware of the disability; and (3) the employer failed to reasonably accommodate the disability. *James v. Hyatt Regency Chicago*, 707 F.3d 775, 782 (7th Cir. 2013); *Kotwica v. Rose Packing Co.*, 637 F.3d 744, 747-48 (7th Cir. 2011). Under the ADA, a "reasonable accommodation" may include "job restructuring, part-time or modified work schedules, reassignment to a vacant position, ... and other similar accommodations for individuals with disabilities," 42 U.S.C. § 12111(9)(B), including a medical leave of absence. 29 C.F.R. pt. 1630, App. § 1630.2(o); *see also EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 805 (7th Cir. 2005).

Once a covered employer becomes aware of an employee's disability, it must engage in "an 'interactive process' to determine the appropriate accommodation under the circumstances." *Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685, 693 (7th Cir. 1998). Even if a plaintiff can show that his disability has not been reasonably accommodated, the employer "will be liable only if it bears responsibility for the breakdown of the interactive process." *Sears*, 417 F.3d at 805. In such circumstances, "courts should attempt to isolate the cause of the breakdown and then assign responsibility." *Beck v. Univ. of Wis. Bd. of Regents*, 75 F.3d 1130, 1135 (7th Cir. 1996).

Defendants seek summary judgment on the ground that: (1) it provided reasonable accommodations for plaintiff's need for a standing desk and schedule modification; (2) plaintiff failed to provide the necessary documentation to justify his request for a new chair; and (3) Darby did not deny him a reasonable accommodation in failing to schedule the meeting plaintiff requested in May of 2018. In opposition, plaintiff argues that: (1) Harmon failed to engage in the interactive process by offering him little to no options with

16

respect to the placement of his standing desk; (2) Harmon's insistence on a doctor's note supporting his request for a different desk was onerous; (3) Bluem mistreated him in arranging his schedule; and (4) Darby's refusal of a May 2018 meeting amounted to a failure to accommodate his disability.  On this record, defendants are entitled to summary judgment.

Starting with his request to stand while working, Harmon promptly provided plaintiff the accommodation suggested in Nurse Practitioner Prince's note.  Indeed, within an hour of requesting a standing desk in October of 2017, plaintiff received the exact accommodation he was requesting, and when he brought it up again in December, his request was again granted, albeit at a different location.  While plaintiff apparently did not like either location, the note from Nurse Practitioner Prince made no reference to a need for him to be near other individuals and at least the first location was only a short distance from his existing desk.  While plaintiff insists that he was shut out of the interactive process when he was not given his personal choice as to the location of the standing desk, a reasonable jury would have *no* basis on this record to find the proposed placement was not suitable to provide the requested accommodation while also maintaining caller confidentiality.   Moreover, an employer is not required to provide the exact accommodation that an employee requests or prefers.  *Hoppe v. Lewis Univ.*, 692 F.3d 833, 840 (7th Cir. 2012); *Brunker v. Schwan's Home Serv., Inc.*, 583 F.3d 1004, 1009 (7th Cir. 2009) (employer is not required to provide employee's "ideal" accommodation).  Rather, to succeed on his claim, plaintiff must do more than prove that defendant failed to engage in an interactive process; there must also be some proof that the employer's proposed

accommodation was unreasonable. *Rehling v. City of Chi.*, 207 F.3d 1009, 1015 (7th Cir. 2000) (plaintiff failed to prove reasonable accommodation claim despite proof that defendant failed to engage in a proper interactive exchange, if undisputed that defendant offered positions that accommodated his needs). Here, there is proof that plaintiff was offered a standup desk that accommodated his disability even if not in locations that he preferred.

Even as to his preference, plaintiff does not dispute that the location of the two standing desks was, at most, a short distance from his original location. Instead, he contends that the proposed locations for his standing desk would have denied him the floor support, communication and camaraderie available to him in his original cubicle location, including that he would never see Hudson. However, defendants submitted evidence that the first proposed location was just on the other side of his cubicle location, and the second was about the distance of four cubicles and across an aisle from his original location. Although plaintiff submits that the second location was poorly lit and far from other employees, he does not explain how the short distance and difference in lighting adversely impacted his ability to perform his tasks. Indeed, given the abundance of evidence showing plaintiff's frequent use of the company's instant messenger system to communicate with his supervisors and other employees about day-to-day issues, a reasonable jury would be hard pressed to find this change in his placement could have such an impact. *See Brumfield v. City of Chicago*, 735 F.3d 619, 632 (7th Cir. 2013) ("[A]n employer need not accommodate a disability that is irrelevant to an employee's ability to perform the essential functions of her job . . . because the employee is fully qualified for the job without [that

18

further] accommodation and therefore is not entitled to [that] accommodation in the first place.").

Finally, there is *no* basis on this record to infer either that the standing desk option was unreasonable or that Harmon failed to engage in the interactive process. To the contrary, *plaintiff* ended the interactive process by rejecting a reasonable accommodation outright, twice. *See Gratzl v. Office of Chief Judges of 12th, 18th, 19th, and 22nd Judicial Circuits*, 601 F.3d 674, 682 (7th Cir. 2010) (when employee rejected proposed accommodations "for personal reasons," "she was responsible for terminating the interactive process and hence not entitled to relief under the ADA.").

As for plaintiff's December 2017 request for a new work chair, plaintiff concedes that he did not submit a medical note explaining his need for a different chair, arguing that obtaining the note would have been "burdensome." This objection makes little sense, given the apparent ease with which he obtained two notes from a nurse practitioner related to the standing desk accommodation just two months earlier. Regardless, "[a]n employer may reasonably request medical support to determine necessary accommodations and deny a request if the employee does not produce it." *Keen v. Merck Scharp & Dohme Corp.*, 819 F. App'x 423, 427 (7th Cir. 2020) (citing *Brown v. Milwaukee Bd. of Sch. Dirs.*, 855 F.3d 818, 821, 824 (7th Cir. 2017)). Certainly, in plaintiff's circumstances, in which his original requested accommodations both related to a need to *stand* rather than sit, it was reasonable for Harmon to request documentation to justify his request for a different chair. Accordingly, Harmon acted reasonably as a matter of law in denying plaintiff's request for a different work chair without any medical support.

19

The result is the same as to Schneider's request for a modified work schedule in April 2018. Plaintiff contends that Bluem's initial schedule, slotting him to work three, eight-hour days in a row, indicated an outright refusal to accommodate his disability, but it is undisputed that Nurse Practitioner Prince's initial medical notes dated March 29 and April 6 did not state that plaintiff could not be scheduled for multiple days in a row. Rather, the March 29 indicated that plaintiff should not be scheduled for more than 24 hours a week, and the April 6 note provided a proposed schedule of training hours and working hours. (*See* dkt. #53-7, at 3-4.) Even if one arguably read into her notes that back-to-back work days would be problematic, there is no dispute that plaintiff went back to work on April 9, *and by April 10*, Bluem had implemented plaintiff's desired schedule. Although plaintiff takes issue with Bluem's attitude towards his desire for breaks, Bluem's response to Schneider's follow-up (adjusting his schedule promptly in light of the Nurse Practitioner Prince's April 10 directive) shows engagement in the interactive process, not a denial of a reasonable accommodation.

This just leaves Operations Manager Darby's denial of plaintiff's May 2018 request to facilitate a meeting between Schneider and his supervisors to discuss his condition in greater detail. The exact nature of plaintiff's desired accommodation is not explained, although he apparently hoped that Darby would facilitate a meeting with all three supervisors on the call center floor, so that plaintiff could provide a complete description of his condition, and the supervisors would then provide information to other employees on a "need to know" basis. As an initial matter, plaintiff does not explain exactly how other employees' ignorance about his condition prevented him from performing the

essential functions of his position, except to again fall back on his claim that he was missing out on a feeling of collegiality that non-disabled employees enjoyed.  Plaintiff further attempts to link this lack of collegiality to his physical condition deteriorating, but submits no evidence in support, except his assertion that absent this meeting, he could not perform the requirements of his job.  In particular, plaintiff provided neither Darby nor this court any evidence that a medical professional agreed such a meeting was necessary.  Most importantly, Darby did not actually deny plaintiff's request.  Instead, she voiced a legitimate concern that her facilitating such a meeting might result in an inappropriate disclosure of plaintiff's confidential health information in violation of his privacy rights.  Thus, Darby referred him to his direct supervisor Bluem to discuss one-on-one his desire to share the details with his condition with other employees.  This does *not* suggest that Darby failed to accommodate his disability.  Rather, the fact that plaintiff opted not to take Darby's advice again falls on the plaintiff, not on defendants.  Accordingly, defendants are entitled to summary judgment on plaintiff's last basis for claiming a failure to accommodate as well.

## II.    Termination Decision

"The ADA [prohibits] an employer from discriminating against a qualified individual with a disability because of the disability." *Jackson v. City of Chic.*, 414 F.3d 806, 810 (7th Cir. 2005) (quoting *Silk v. City of Chic.*, 194 F.3d 788, 798 (7th Cir. 1999)).  "'To prove a violation of § 12112(a), a plaintiff must show that:  (1) he is disabled; (2) he is otherwise qualified to perform the essential functions of the job with or without reasonable

21

accommodation; and (3) the adverse job action was caused by his disability." *Roberts v. City of Chi.*, 817 F.3d 561, 565 (7th Cir. 2016). "To establish the third prong and survive summary judgment, a plaintiff must show a genuine issue of material fact exists regarding whether his disability was the 'but for' reason for the adverse action, in this case termination." *Monroe v. Ind. Dep't of Transp.*, 871 F.3d 495, 503-04 (7th Cir. 2017) (citing *Sewatka v. Rockwell Automation, Inc.*, 591 F.3d 957, 962 (7th Cir. 2010). Under this standard, plaintiff's proof that his disability contributed to defendant's termination decision is even more lacking than for his accommodation claim.

"In discrimination cases, 'when a defendant moves for summary judgment, the "singular question" for the district court is whether the plaintiff has introduced evidence that would 'permit a reasonable fact finder to conclude that the plaintiff's . . . proscribed factor caused the discharge or other adverse employment action.'" *Igasaki v. Illinois Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, (7th Cir. 2021) (quoting *Purtue v. Wisconsin Dep't of Corr.*, 963 F.3d 598, 602 (7th Cir. 2020), *reh'g denied* (quoting *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 894 (7th Cir. 2018))). Although a plaintiff may offer direct or circumstantial evidence in support of his claim, the Seventh Circuit has explained that "all evidence belongs in a single pile and must be evaluated as a whole." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 766 (7th Cir. 2016).

Defendants have provided fairly compelling evidence that plaintiff's termination was due to his behavior alone, pointing generally to his disciplinary record at Harmon, and specifically to his disturbing, persistent communications with Hudson in 2017 and 2018, even after express warnings that they must stop. In opposition, plaintiff focuses on his

belief that his termination was based on the false charge of stalking and harassment, suggesting that those concerns were pretextual and apparently hoping the court would find those charges wholly unsupported by the record.

"In determining whether an employer's stated reason [for discharge] is pretextual, the question is not whether the employer's stated reason was inaccurate or unfair, but whether the employer honestly believed the reason it has offered to explain the discharge.'" *Monroe*, 871 F.3d at 505 (quoting *Harper v. C.R. England, Inc.*, 687 F.3d 297, 311 (7th Cir. 2012)). Here, plaintiff acknowledges, as he must on this record, not only that he was disciplined on multiple occasions between 2017 and 2018, but also that there was a legitimate basis for each of the disciplinary actions. Most importantly, in September 2017, when plaintiff was disciplined for his inappropriate instant messages with Hudson, plaintiff admitted that his statements about Native Americans and Asians were inappropriate, as were his flirtatious statements to Hudson. At that time, plaintiff was explicitly warned that he violated the policy governing interactions with customers and co-workers, *and* that another violation would result in further disciplinary action, including possible termination.

Plaintiff claims that he did not commit another violation of that policy in 2018, arguing in particular that he never actually "stalked" Hudson at the end of a shift in June of 2018. Even assuming plaintiff had not lurked about following his own shift for Hudson to leave the office in order to talk to her (as defendants maintain), that does not render the termination pretextual, especially given plaintiff's other, equally inappropriate actions towards Hudson during that same time frame. For example, even after defendants'

warning, plaintiff acknowledges sending her flowers, which was followed by a series of Facebook messages that went unanswered by Hudson, and when she continued not to respond, commenting at work using the company's instant messenger service, "Look, I won't bite, I just sent you flowers."  Even without Hudson's subsequent, additional formal harassment complaint, this was good grounds for defendants to find plaintiff continued to harass Hudson both off the job *and* at work despite an express warning that termination may result.  Although plaintiff insists that he was unable to defend himself before being terminated, he neither suggests that he could have refuted this series of events, nor that they made Hudson uncomfortable.  Similarly, there is no basis for plaintiff to dispute that he had been expressly warned about the consequences of any repetition of that behavior.  In short, *no* evidence suggests that defendants' decision to terminate him was not a direct result of his engaging with Hudson, and no reasonable jury could find the absence of a legitimate and sincere concern that plaintiff was violating company policy governing professional interactions between customers and co-workers.

Finally, plaintiff insists that he did not intend to harass or bother Hudson, and if his behavior towards her seemed aggressive, rude or controlling, his own intense fatigue, discomfort and pain is to blame.  However, as immense as the challenges of navigating daily life may be for plaintiff, his employer does not have to tolerate repeated incivility or misconduct that may occur in the workplace.  To the contrary, "an employer may, consistent with the ADA and the Rehabilitation Act, terminate an employee for inappropriate behavior even when that behavior is precipitated by the employee's disability."  *Felix v. Wisconsin Dept's of Transp.*, 828 F.3d 560, 574 (7th Cir. 2016).

24

Accordingly, since no reasonable jury could find that defendants terminated plaintiff because of his disability, they are entitled to summary judgment.

ORDER

IT IS ORDERED that:

1.    Plaintiff Scott Thomas Schneider's motion to correct (dkt. #72) is GRANTED.

2.    Defendants Harmon Solutions Group LLC and Code Blue LLC's motion for summary judgment (dkt. #36) is GRANTED.

3.    The clerk of court is directed to enter judgment in defendants' favor and close this case.

Entered this 3rd day of September, 2021.

BY THE COURT:

/s/

WILLIAM M. CONLEY
District Judge